JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Dominick Pistone

**DEFENDANTS**
Zimmer Biomet, Inc.

(b) County of Residence of First Listed Plaintiff **Northampton**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
John E. Riley, Esquire
Conrad O'Brien, PC, 1500 Market St. Ste.3900
Phila., PA 19102-2100, 215-523-8336

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [X] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 400 State Reapportionment |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | | [ ] 410 Antitrust |
| [ ] 140 Negotiable Instrument | | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 430 Banks and Banking |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 320 Assault, Libel & Slander | | | PROPERTY RIGHTS | [ ] 450 Commerce |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| | [ ] 345 Marine Product Liability | | | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | | PERSONAL PROPERTY | LABOR | SOCIAL SECURITY | [ ] 490 Cable/Sat TV |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [X] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| | | | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | [ ] 791 Employee Retirement Income Security Act | FEDERAL TAX SUITS | [ ] 896 Arbitration |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | Habeas Corpus: | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities Employment | [ ] 535 Death Penalty | IMMIGRATION | | |
| [ ] 290 All Other Real Property | | Other: | [ ] 462 Naturalization Application | | |
| | [ ] 446 Amer. w/Disabilities Other | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | [ ] 448 Education | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):* 28 U.S.C. §1332(a)(1)
Brief description of cause: Retaliatory termination of employment and slander

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
- DEMAND $ _____
- CHECK YES only if demanded in complaint:
- JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE 6/27/16
SIGNATURE OF ATTORNEY OF RECORD  /s/ John E. Riley

**FOR OFFICE USE ONLY**
RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Dominick Pistone, 4538 Joshua Lane, Walnutport, PA  18088

Address of Defendant: Zimmer Biomet, Inc., 1800 West Chester St., Warsaw, IN 46581-0708

Place of Accident, Incident or Transaction: PA
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐   No☐

Does this case involve multidistrict litigation possibilities?   Yes☐   No☒

RELATED CASE, IF ANY:
Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
   (Please specify) Wrongful employment termination (and slander)

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, John E. Riley, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: June 27, 2016   _____ Attorney-at-Law   22504 Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: June 27, 2016   _____ Attorney-at-Law   22504 Attorney I.D.#

CIV. 609 (5/2012)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CASE MANAGEMENT TRACK DESIGNATION FORM

Dominick Pistone             :    CIVIL ACTION
       v.              :
Zimmer Biomet, Inc.            :    NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.   ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.   ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.   ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)   ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   (X)

| June 27, 2016 | _/s/_ | Dominick Pistone |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-523-8336 | 215-864-9620 | jeriley@conradobrien.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------------x
DOMINICK PISTONE,                           :
                                            :
                Plaintiff,          :   CIVIL ACTION NO.:_____
                                            :
        v                                  :
                                            :   JURY TRIAL DEMANDED
ZIMMER BIOMET, INC.,                        :
                                            :
                Defendant.          :
                                            :
---------------------------------------------------------------x

## COMPLAINT

COMES NOW Plaintiff Dominick Pistone ("Plaintiff" or "Pistone"), by and through his undersigned attorneys, and presents his Complaint against Defendant Zimmer Biomet, Inc. ("Zimmer") alleging as follows:

### Nature of the Case

1. This action arises from Defendant's wrongful and retaliatory termination of Plaintiff Pistone after he provided testimony before a Northampton grand jury in connection with what he reasonably believed to be the patent misconduct of an orthopedic surgeon in Allentown, Pennsylvania ("Dr. X"), and the medical practice with which he is affiliated ("Company Y").[1]

2. By this action, the Plaintiff is seeking, among other things, compensatory damages of no less than $5 million and punitive damages of no less than $10 million.

---

[1] Although their real names are known, Plaintiff is using the placeholder names "Dr. X" and "Company Y" at this time in an attempt to avoid further, retaliatory actions.

### Jurisdiction and Venue

3. The Court has jurisdiction over this action under 28 USC § 1332(a)(1) because the Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

4. Venue is proper in this district under 28 USC § 1391(a)(2) because all or a substantial portion of the events that gave rise to Plaintiff's claims transpired in this district.

### The Parties

5. Plaintiff Dominick Pistone is an individual residing in Walnutport, Pennsylvania.

6. Defendant Zimmer Biomet Inc. ("Zimmer") is a Delaware Corporation with its principal place of business at 1800 West Center Street, Warsaw, IN 46581-0708. Zimmer is the Plaintiff's former employer.

### Background Facts

#### Pistone's Illustrious Career with Zimmer

7. Pistone's 25 year-career with Zimmer was exemplary in every respect. Pistone was elected by Zimmer to the "Hall of Fame," which is a select group of representatives who have received more than ten "President Club" awards – a prestigious honor given annually to the top 3% of Zimmer's salespeople based on a combination of sales and percentage above quota. While working for Zimmer, Pistone helped grow the business within the Lehigh Valley territory from $350,000 per year to $8,500,000 per year, and ultimately helped generate hundreds of millions of dollars for Zimmer.

8. Pistone was hired by Zimmer in late 1989 as a trauma consultant and in 1990 he transitioned to Zimmer Randall Associates, an exclusive distributor for Zimmer products, where he worked until approximately 2012 as a sales associate for Mark Randall ("Randall"). At the

time, Zimmer did not directly employ its sales teams. Rather, it contracted its sales force through distributors who exclusively sold Zimmer products. Those employees received, and were bound by, Zimmer's policies, including its Code of Conduct.

9. In 2012, when Randall retired, Zimmer, Inc. took over the distributorship and Pistone became a direct employee of Zimmer and the head of a five person sales team whose income came from Pistone's commissions. At that time, Pistone was trusted to oversee millions of dollars in implants and inventory, and was highly respected during his interactions with Zimmer's largest clients.

**In 2007, Zimmer Settles with the US Attorneys' Office in Connection with Alleged Anti-Kickback Violations and Adopts a Comprehensive Code of Conduct and Compliance/Whistleblowing Program**

10. On September 27, 2007, then U.S. Attorney for the District of New Jersey Christopher J. Christie ("Christie")[2] announced an important agreement which his office had reached with Zimmer and five other companies in the hip and knee replacement industry in connection with violations of the federal anti-kickback statute.

11. Specifically, Zimmer executed a Deferred Prosecution Agreement ("DPA"), which provided that the government's complaints against Zimmer would be dismissed at the conclusion of 18 months as long as Zimmer complied with the DPA, pursuant to which Zimmer (i) agreed to the appointment of a federal monitor (former US Attorney General John Ashcroft), (ii) agreed to pay approximately one hundred and seventy million dollars ($170,000,000), and (iii) agreed to implement a substantial compliance program.

12. As part of its new compliance program, Zimmer enacted a new Code of Conduct relating to compliance and reporting, in which Zimmer stated that it was committed to

---

[2] Christie is currently the Governor of the State of New Jersey and recently ran to become the Republican Party nominee for the office of President of the United States.

conducting every facet of its business activities in compliance with all applicable laws and regulations and that all Zimmer personnel would be required to report any known or suspected violations of law, violations of the Zimmer code, and violations of all governmental programs. The Code of Conduct further stated that if a Zimmer employee withheld information related to an actual or suspected compliance issue, the employee would be subject to disciplinary action including possible termination. Pistone was aware of the new Code of Conduct and believed Zimmer truly meant for the Code to be followed.

13.     Further, in order to make it easier for employees to report violations of the Code of Conduct and the law, Zimmer established a 24 hour a day, 7 days a week Compliance Hotline contact number and widely distributed information related to the hotline to all employees. Under Zimmer's policy, the caller would remain anonymous, and Zimmer employees were required to investigate and follow up on all compliance reports. Significantly, Zimmer's policy provided that Zimmer prohibited retaliation against any individual who made a report of a suspected compliance or legal issue. Zimmer also advised its employees that if any employee failed to comply with the Zimmer Code of Conduct regarding compliance and reporting, the individual could be subjected to fines and criminal charges by failing to report violations known to the employee. Pistone also believed that Zimmer, because of its Code provisions, would support employees for upholding the ethical obligations mandated by the Code.

14.     Without question, the steps adopted by Zimmer regarding compliance suggested that Zimmer was committed to abandoning the prior unlawful manner in which it conducted its business by replacing those methods with compliance policies centered around honesty and integrity. It now appears, however, that Zimmer adopted these policies solely to prevent the U.S. Attorney's Office from indicting the Company.

4

**In 2007, Pistone Became Concerned About the Unlawful Practices of Dr. X**

15.     In or about 2007, Pistone spoke with his brother, Joseph Pistone -- a former highly decorated FBI agent about whom the movie "Donnie Brasco" was made -- regarding concerns he had related to Dr. X and a company known as "OtisMed." Specifically, Pistone had personally observed and/or been informed by others, that: (i) Dr. X was performing numerous double knee replacements, well above the average, upon information and belief primarily for financial gain and not in the best interest of the patients; and (ii) Dr. X was not informing patients that OtisMed's product, the OtisKnee, had not obtained FDA approval. Pistone was very upset with what he saw happening to a large number of patients who were being treated by Dr. X, and who were being exposed to the products of OtisMed Corporation. Upon hearing Pistone's concerns, his brother advised him to report the violations to the FBI.

16.     In accordance with the Zimmer Code and his brother's advice, Pistone decided to go to the FBI. However, before he did so, in 2007 he fully disclosed to Randall, his direct supervisor at Zimmer, what he was witnessing and what he was planning to do to. In response, Randall told Pistone that he should report to the FBI what Pistone had told him about Dr. X and OtisMed Corporation.

17.     Pistone was motivated only by a sense of doing the right thing and sought no personal gain. When he met with an FBI agent in Allentown, PA, he fully and truthfully told him what he knew, but he told the agent he wanted to remain anonymous. The agent told Pistone that if he was not willing to give his name and give a sworn statement, and be a witness in court, then nothing further could be done. Having concern about losing anonymity, Pistone ultimately decided that he could not proceed at that time.

**Between 2008 and 2012, Pistone Reports Unlawful Activity**

18.     Thereafter, in or around 2008, Governor Christie appeared as the keynote speaker at Zimmer's national sales meeting. Following his speech, Governor Christie, who was told that Joe Pistone's brother was in the audience, approached Pistone and spoke highly about the work of his brother Joe with the FBI. While speaking with Pistone, Governor Christie told him that he should emulate his brother, always do the right thing, and follow all of the compliance guidelines that Zimmer had established.

19.     Following his encounter with Governor Christie, Pistone again spoke to Randall in February 2008, telling him that that he was going to report OtisMed and Dr. X to the Zimmer anonymous hotline. Shortly thereafter, Pistone called the hotline and reported what he knew and believed about Dr. X and OtisMed. He was assigned a pin number and was told that he would be contacted. Incredibly, and upon information and belief, Zimmer did nothing in response to Pistone's call.

20.     Thereafter, on September 2, 2009, the FDA sent OtisMed a notice that its submission for FDA approval had been denied, noting that the company had failed to demonstrate the OtisKnee was as safe and effective as other legally marketed devices, and the products were pulled from the market.

21.     Dr. X joined Company Y on or about June 1, 2010 and, upon information and belief, Dr. X's practice of performing unnecessary procedures continued at Company Y. Indeed, a large number of Company Y nurses and surgeons openly discussed Dr. X's improper practices in the operating room.

22.     Accordingly, in 2011, Pistone wrote an anonymous letter to a newspaper and to the District Attorney's office in three counties in the surrounding area detailing what he believed were unlawful activities by Dr. X. Unfortunately, the letter went unacknowledged.

23.     Subsequently, in or about early 2012 (prior to becoming a direct Zimmer employee), Pistone sent a second anonymous letter to the same organizations because he observed that the misconduct was continuing and he felt that he could not stand by and do nothing. Pistone reasonably believed that Dr. X and Company Y were engaging in illegal, immoral, and improper activity, all to the detriment of patients and to the federal government's medical reimbursement system. Again, the second letter went unacknowledged.

24.     When he contacted the FBI, and when he wrote each of his two anonymous letters, Pistone was motivated only to expose the wrongdoings and to help people from being further victimized. He never sought personal gain and did not want his name to be associated with the reporting activity. Again, his reporting to the FBI and the Zimmer hotline were done with the knowledge and consent of Randall.[3]

**In Early 2015, Pistone Testifies Before a Grand Jury**

25.     In February 2015, Pistone received a subpoena from the Northampton District Attorney to appear and testify before a grand jury. In response, Pistone promptly contacted Vince Fath -- then the General Manager of Zimmer Keystone -- and Lisa Dunkin, Esq. -- Zimmer's Senior Litigation Counsel -- and made them aware of the subpoena and the subject matter of his testimony. Tellingly, Fath's immediate reaction to Pistone was, "this must be about

---

[3] Pistone's allegations concerning Dr. X were consistent with the allegations set forth in a qui tam Complaint filed in this Court on behalf of the United States government against Dr. X, Company Y, and others alleging, upon information and belief, that they "(1) performed countless unnecessary and non-beneficial lateral release procedures for the purpose of obtaining extra compensation for each patient; and (2) submitted numerous fraudulent bills to Medicare requesting compensation for lateral release procedures where no lateral release procedure was performed."

Dr. X or [another doctor]." Pistone asked if Zimmer would provide an attorney to appear with him and represent him before the grand jury, to which Dunkin replied, "No, just give your testimony and report back to me after you have testified."

26. On March 19, 2015, with Zimmer's knowledge and permission, Pistone testified before the grand jury. He was questioned by the District Attorney himself, the Honorable John M. Morganelli. During his testimony, one of the grand jurors, a nurse, congratulated Pistone and told him that there should be more people like him that have the courage to speak out against patient abuse and that people in the medical field should consider the rights of patients above profit.

27. Following Pistone's testimony, he reported back to Dunkin and Fath as to the nature of his testimony, making them aware that it did in fact concern a letter he had written about Dr. X. He also told Dunkin that D.A. Morganelli had told him that neither he (Pistone) nor Zimmer were targets of the probe. In response, Dunkin told Pistone that since neither he nor Zimmer was a target of the probe he should not worry about his testimony and that everything would be fine. Following his testimony, Detective Walsh (the Detective who worked for D.A. Morganelli) contacted Pistone and met him on a number of occasions to obtain additional information.

**On May 28, 2015, Zimmer Begins to Retaliate against Pistone in Connection with <u>his Whistleblowing Activities</u>**

28. Shortly thereafter, on May 28, 2015, Pistone was contacted via telephone by Nate Hwang, Esq. ("Hwang"), another of Zimmer's in-house attorneys.[4] Hwang informed Pistone that Company Y and its CEO were threatening to sue Zimmer as a result of an "anonymous letter

---

[4] According to his Linkedin bio, Mr. Hwang served as Zimmer's Vice President, Compliance Officer and Senior Healthcare Counsel, Americas, until July 2015, following which Mr. Hwang became Zimmer's Vice President, Strategic Alliances.

8

that [Company Y's CEO] was accusing Pistone of writing." Hwang then proceeded to chastise Pistone for writing the letter without notifying Zimmer of his intentions. In response, Pistone told Hwang that he wrote the letter anonymously as a concerned private citizen and that he never mentioned Zimmer in the letter. He also told Hwang that he stood behind what he wrote because he reasonably believed innocent patients were being injured by the actions of Dr. X and, as described above, Pistone had already informed Zimmer of his actions in reporting the misconduct – including his recent testimony before the grand jury.

29. Upon information and belief, Company Y and its CEO had obtained a copy of Pistone's anonymous letter in or about 2011, but did nothing until the grand jury began calling witnesses to testify, four years later.

30. During the course of their dialogue, Hwang asked Pistone if he "realized how much money this was going to cost Zimmer to defend the suit brought by [Company Y] against Zimmer?" Pistone responded to Huang by emphasizing his concern that Dr. X needed to be exposed to protect innocent patients. Hwang never took the time to meet with Pistone, nor attempted to find out what the allegations were regarding Dr. X. His only concern was what it would cost Zimmer.

**Zimmer Suspends Pistone Purportedly as a Result of Company Y's Actions**

31. On the evening of May 28, 2015, Pistone was notified by Fath that both he and his son Ryan Pistone, who also worked for Zimmer as part of Pistone's five-person sales team, had been suspended by Company Y from servicing their account with Zimmer. The next day, Fath also informed Pistone that he was suspended indefinitely with pay by Zimmer pending the outcome of the "[Company Y] situation."

9

32.     On June 1st, 3rd and 4th, 2015, Pistone had extensive discussions with D.A. Morganelli and representatives of the D.A.'s office. D.A. Morganelli indicated that he was shocked that Zimmer had suspended Pistone and that he had no idea why Zimmer would do such a thing. Detective Walsh of the D.A.'s office likewise said that he was stunned to learn that Company Y and its CEO had taken actions against Zimmer and Pistone, adding further that Pistone was well within his rights to speak up to protect innocent patients. Walsh offered to speak to anyone at Zimmer to let them know that what Pistone did was the morally and ethically proper thing to do. On June 14th, Pistone reached out to the FBI agent that he spoke to in 2007. That agent not only recalled Pistone and their conversation, but had kept his notes to verify all that was done. He offered Pistone his support and advised him that he would testify truthfully as to all that occurred between them.

**In mid-June 2015, Zimmer Unlawfully Terminates Pistone's Employment**

33.     On June 12, 2015, Pistone received a call from Donna Stover -- an administrative assistant at Zimmer -- indicating that Fath wanted to meet with him at a coffee shop in Allentown on Monday, June 15th.

34.     On June 15th, Pistone met with Fath as requested. When Pistone arrived, he saw Fath, Lisa Crane ("Crane") -- then a Senior Human Resources Partner at Zimmer -- and Michael Costanzo, then one of Zimmer's Sales Directors. Pistone walked up to the table and Fath asked him to sit down, at which point he read Pistone a prepared statement informing him that Zimmer -- "at the highest levels" -- had decided to part ways with Pistone because, as a result of his suspension from Company Y, he had a "diminished capacity" to sell in the Lehigh Valley.

35.     The statement that Pistone had a "diminished capacity" was false and defamatory. Notwithstanding his improper suspension by Company Y, Pistone remained one of Zimmer's top

salespeople and was bringing in substantial business from numerous other accounts. Indeed, in 2014, Pistone's team brought in $7.8 million in business in the Lehigh Valley, of which Company Y accounted for $1.1 million.

36. Fath then handed the meeting over to Crane who went through the terms of a severance package offered by Zimmer. Pistone was given a proposed severance agreement offering him a little over $200,000 -- less than a year's severance -- in exchange for a release of his claims. Pistone's twenty-five plus years as a loyal, hard-working, and exemplary employee with Zimmer was over in a conversation that lasted no longer than eight minutes. Pistone was never told what he did wrong.

37. Incredibly, the Severance Agreement contained a "claw back" provision obligating Pistone to return the entirety of the severance payment if it were subsequently discovered that he "failed to disclose during [his] employment any potential material violations of the applicable law or Zimmer's Code of Conduct." The hypocrisy of this statement is inexplicable and mind-boggling: Zimmer fired Pistone because he did exactly what that clause indicated he was supposed to do -- disclose violations of applicable law and/or Zimmer's Code of Conduct

38. Not only has Pistone's career been destroyed, upon information and belief he has been the topic of conversations on a regular basis with rumors and innuendos being circulated about him by high ranking Zimmer employees, as well as by Dr. X, Company Y's CEO, and other individuals employed by Company Y. Among other things, Vince Fath (formerly a high ranking Zimmer employee) repeatedly made disparaging and defamatory comments about Pistone, claiming falsely to third parties inside and outside of Zimmer that Pistone had a "diminished capacity."

39.     In addition, after Pistone was fired, Fath sent out an e-mail stating that Pistone had decided to leave Zimmer and "retire" -- another false statement. Thereafter, when senior sales reps contacted Fath to inquire further about Pistone's separation from Zimmer, Fath told them that he was not at liberty to discuss anything, that they couldn't ask him questions, and that they would have to contact Pistone directly if they wanted to know what happened, and that the foregoing came from "the highest levels of Zimmer," implying that Pistone had done something wrong.

## FIRST CLAIM FOR RELIEF
### (Wrongful Discharge -- Violation of Public Policy)

40.     Plaintiff Pistone repeats and realleges the allegations contained in paragraphs 1-39 as if fully set forth herein.

41.     Pennsylvania law prohibits employers from terminating employees in violation of public policy.

42.     On June 15, 2015, Zimmer terminated Pistone's employment in retaliation for his whistleblowing activities (including his providing testimony before a grand jury) regarding what he reasonably believed to be illegal conduct by Company Y, one of Zimmer's largest customers, and one of Company Y's doctors, Dr. X.

43.     Indeed, following Pistone's grand jury testimony, Company Y suspended Pistone from working on its account and threatened Zimmer with a lawsuit as a result of Pistone's allegations of misconduct against Company Y and Dr. X.

44.     Following Company Y's actions, Zimmer promptly suspended Pistone and, shortly thereafter, terminated his employment.

45.     Zimmer's actions violated public policy by terminating Pistone for responding to a subpoena, participating in the grand jury proceedings, and reporting illegal activity.

46.     As a result of the foregoing, Pistone has sustained compensatory damages in an amount in excess of $75,000.

47.     Further, as a result of the outrageous conduct described above, Pistone is also entitled to punitive damages.

## SECOND CLAIM FOR RELIEF
### (Wrongful Discharge -- Breach of Zimmer Code of Conduct)

48.     Plaintiff Pistone repeats and realleges the allegations contained in paragraphs 1-47 as if fully set forth herein.

49.     The Zimmer Code of Conduct (the "Code") requires all Zimmer personnel to report any known or suspected violations of law, violations of the Zimmer code, and violations of all governmental programs. The Code further states that if a Zimmer employee withholds information related to an actual or suspected compliance issue, the employee would be subject to disciplinary action including possible termination. The Code also prohibits retaliation against any individual who makes a report of a suspected compliance or legal issue.

50.     On June 15, 2015, Zimmer terminated Pistone's employment in retaliation for his whistleblowing activities (including but not limited to his providing testimony before a grand jury) regarding what he reasonably believed to be illegal conduct by Company Y, one of Zimmer's larger customers, and one of Company Y's doctors, Dr. X.

51.     Indeed, following Pistone's grand jury testimony, Company Y suspended Pistone from working on its account and threatened Zimmer with a lawsuit as a result of Pistone's allegations of misconduct against Company Y and Dr. X.

52. Following Company Y's actions, Zimmer promptly suspended Pistone and, shortly thereafter, terminated his employment.

53. Although Pistone complied with the Code, Zimmer violated/breached the Code by retaliating against Pistone when it suspended, and then terminated, his employment.

54. As a result of the foregoing, Pistone has sustained compensatory damages in an amount in excess of $75,000.

55. Further, as a result of the outrageous conduct described above, Pistone is also entitled to punitive damages.

### THIRD CLAIM FOR RELIEF
### (Slander Per Se)

56. Plaintiff Pistone repeats and realleges the allegations contained in paragraphs 1-55 as if fully set forth herein.

57. In June 2015, and thereafter, Zimmer has stated to third parties that Pistone has a "diminished capacity' and was fired because he "has a diminished capacity."

58. These statements are knowingly false, disparaging, and defamatory.

59. In addition, after Pistone was fired, Fath sent out an e-mail stating that Pistone had decided to leave Zimmer and "retire" -- another false statement. Thereafter, when senior sales reps contacted Fath to inquire further about Pistone's separation from Zimmer, Fath told them that he was not at liberty to discuss anything, that they couldn't ask him questions, and that they would have to contact Pistone directly if they wanted to know what happened, and that the foregoing came from "the highest levels of Zimmer," implying that Pistone had done something wrong.

60. Pistone was shocked and outraged to hear these statements and has suffered personal humiliation, mental anguish, and damage to his reputation and standing in the community.

61. The statements are malicious and untrue and directly relate to Pistone's professional reputation.

62. As a result of the foregoing, Pistone has sustained compensatory damages in an amount in excess of $75,000.

63. Further, as a result of the outrageous conduct described above, Pistone is also entitled to punitive damages.

## FOURTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

64. Plaintiff Pistone repeats and realleges the allegations contained in paragraphs 1-63 as if fully set forth herein.

65. In June 2015, and thereafter, Zimmer has stated to third parties that Pistone has a "diminished capacity' and was fired because he "has a diminished capacity."

66. These statements are knowingly false, disparaging, and defamatory.

67. These statements were made intentionally and/or recklessly.

68. These statements are knowingly false, disparaging, and defamatory.

69. In addition, after Pistone was fired, Fath sent out an e-mail stating that Pistone had decided to leave Zimmer and "retire" -- another false statement. Thereafter, when senior sales reps contacted Fath to inquire further about Pistone's separation from Zimmer, Fath told them that he was not at liberty to discuss anything, that they couldn't ask him questions, and that they would have to contact Pistone directly if they wanted to know what happened, and that the

foregoing came from "the highest levels of Zimmer," implying that Pistone had done something wrong.

70. Pistone was shocked and outraged to hear these statements and has suffered personal humiliation, mental anguish, and damage to his reputation and standing in the community.

71. The statements are malicious and untrue and directly relate to Pistone's professional reputation.

72. As a result of the foregoing, Pistone has sustained compensatory damages in an amount in excess of $75,000.

73. Further, as a result of the outrageous conduct described above, Pistone is also entitled to punitive damages.

WHEREFORE, Plaintiff respectfully demands the following relief:

    (a)    Compensatory damages in excess of $75,000;

    (b)    Punitive damages;

    (c)    Costs and disbursements of this suit, including reasonable attorneys' fees and experts' fees;

    (d)    Pre- and post-judgment interest; and

    (e)    Such other relief as to this Court may deem just, equitable, and proper.

**CONRAD O'BRIEN PC**

By: _____
John E. Riley, Esquire (Attorney I.D. No. 22504)
Kevin D. Kent, Esquire
1500 Market Street, Centre Square
West Tower Suite 3900
Philadelphia, PA 19102-2100
215-523-8336
jeriley@conradobrien.com

**KAPLAN KRAVET & VOGEL PC**

Donald Kravet, Esq.
630 3rd Avenue
New York, NY 10017
646-248-5460
dkravet@kkvpc.com
*Attorneys for Plaintiff Dominick Pistone*

Dated: June 27, 2016

17